# United States Tax Court

T.C. Memo. 2023-140

KUNJLATA J. JADHAV AND JALANDAR Y. JADHAV,
Petitioners

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————

Docket No. 12520-19.            Filed November 21, 2023.

————

*Dustin R. Jeffords* and *Philip M. Anthony*, for petitioners.

*Ardney J. Boland* and *Emile L. Hebert*, for respondent.

### MEMORANDUM FINDINGS OF FACT AND OPINION

VASQUEZ, *Judge*: Respondent determined deficiencies in petitioners' federal income tax and section 6662(a) accuracy-related penalties for underpayments due to substantial understatements of income tax as follows:[1]

| Year | Deficiency | Penalty § 6662(a) |
|---|---|---|
| 2014 | $265,990 | $53,198.00 |
| 2015 | 204,817 | 40,963.40 |
| 2016 | 141,039 | 28,207.80 |
| 2017 | 50,727 | 10,145.40 |

---

[1] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C., in effect at all relevant times, regulation references are to the *Code of Federal Regulations*, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure.

**[\*2]**  In an Amended Answer filed November 12, 2019, and a Second Amended Answer lodged October 21, 2020, respondent alleged increased deficiencies and section 6662(a) accuracy-related penalties for 2015, 2016, and 2017 as follows:

| Year | Deficiency after increase | Penalty after increase § 6662(a) |
| --- | --- | --- |
| 2015 | $248,587 | $49,717.40 |
| 2016 | 167,730 | 33,546.00 |
| 2017 | 157,078 | 31,415.40 |

After concessions,[2] the issues for decision are whether (1) petitioners may deduct a pension contribution for taxable year 2014, (2) petitioners' S corporation may deduct marketing fees for the years in issue, (3) petitioners' S corporation may deduct rent paid (or purportedly paid) to petitioners during the years in issue, (4) petitioners and/or their S corporation may deduct travel expenses for the years in issue, and (5) petitioners are liable for section 6662(a) accuracy-related penalties for the years in issue.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found.  We incorporate the First Stipulation of Facts, First Supplemental Stipulation of Facts (as amended by the First Supplement to First Supplemental Stipulation of Facts), and accompanying Exhibits by this reference.[3]  Petitioners resided in Texas when the Petition was timely filed.

*Business and family background*

Petitioner husband, Jalandar Y. Jadhav, received a Ph.D in chemistry on a date not established by the record.  At all relevant times he worked for Mobile Rosin Oil Co., Inc. (Mobile), as a salaried employee. As an executive for Mobile, petitioner husband was responsible for

---

[2] On May 18, 2020, the parties filed a Stipulation of Settled Issues.  Therein petitioners conceded that (1) they had underreported gross receipts for the years in issue and (2) they had failed to report a taxable state income tax refund for 2014.  The Stipulation of Settled Issues also includes partial concessions by the parties regarding petitioners' S corporation's "other" deductions for the years in issue.  We address those concessions *infra* notes 9 and 13.

[3] Respondent reserved objections to portions of stipulated Exhibits 20-P, 29-P, and 30-P, and we reserved ruling on the admissibility of those documents at trial.  We overrule respondent's objections.

[*3] increasing sales, developing new marketing ideas, and learning new areas of technology. During the years in issue Mobile paid him a yearly salary ranging between $154,000 and $159,000.

In addition to working for Mobile, petitioner husband owned and operated a sole proprietorship from 2006 to 2014. Doing business as "K J Marketing," petitioner husband identified new markets for chemical producers and connected them with potential customers. K J Marketing earned commissions on sales to the customers petitioner husband identified. For 2006 through 2014 petitioners reported K J Marketing's income and expenses on Schedules C, Profit or Loss From Business. For reasons not explained by the record, petitioners named petitioner wife, Kunjlata Jadhav, as the owner of K J Marketing on their tax returns. Petitioner wife, who did not testify at trial, worked as a substitute teacher until 2014.

K J Marketing maintained a section 401(k) retirement plan with Oppenheimer Funds (Oppenheimer). On April 10, 2015, petitioners mailed Oppenheimer a $104,350 check payment to cover contributions to the accounts of petitioner wife and their two sons, Veerendra and Arjun Jadhav, for taxable year 2014. Petitioners instructed Oppenheimer to allocate the $104,350 payment as follows:

Kunjlata J Jadhav (SS# )
| | |
|---|---|
| 2014 Maximum allowed employee deferral contribution | =$17,500.00 |
| 2014 Maximum 401(K) catch-up contribution | =$ 5,500.00 |
| 2014 Maximum allowed profit sharing contribution | =$34,500.00 |
| Maximum allowed total contribution for 2014 | =$57,500.00 |

Veerendra J Jadhav (SS# )
| | |
|---|---|
| 2014 Maximum allowed employee contribution | = $17,500.00 |
| 2014 Profit sharing contribution | = $ 5,925.00 |
| Total contribution for 2014 | = $23,425.00 |

Arjun J Jadhav (SS# )s
| | |
|---|---|
| 2014 Maximum allowed employee contribution | =$17,500.00 |
| 2014 Profit sharing contribution | =$ 5,925.00 |
| Total contribution for 2014 | =$23,425.00 |

Petitioners viewed K J Marketing as a family business and wished to pass it on to Veerendra and Arjun. Petitioner husband started training his sons when they were in high school. While Veerendra and Arjun were in college, he assigned them research tasks and oversaw their work. Veerendra attended the University of Alabama in

[*4] Birmingham, Alabama, from 2006 to 2015, and Arjun attended the University of South Alabama in Mobile, Alabama, from 2009 to 2015.

*Petitioners' residential properties*

In 2005 petitioners purchased a residential property in Daphne, Alabama (Daphne property). Petitioners used the Daphne property as their primary residence until 2014 when they moved to Spring, Texas.

In or about 2009 petitioners purchased a residential property in Birmingham, Alabama (Birmingham property). Veerendra resided at the Birmingham property while attending the University of Alabama. In November 2015 petitioners sold the Birmingham property.

In 2010 petitioners purchased a residential property in Mobile, Alabama (Mobile property). Arjun resided at the Mobile property while attending the University of South Alabama. In November 2015 petitioners sold the Mobile property.

In 2013 petitioners purchased a residential property in Spring, Texas (Spring property). Petitioners moved to the Spring property in 2014, and it was their primary residence at the time of trial.

*Income tax plan*

By 2014 K J Marketing was generating substantial income.[4] Around that time petitioners engaged Capital Protection Services, LLC (CPS), to evaluate their organizational structure, facilitate succession planning, and reduce their tax exposure. For $50,000 CPS provided petitioners a 183-page "Income Tax Plan" (Plan). After interviewing petitioners and reviewing their financial information,[5] CPS estimated that petitioners' "average tax rate" (ratio of tax to taxable income) was 37%. CPS stated that, if petitioners adopted the recommendations in the Plan, they could reduce their "average tax rate" to 9%. According to CPS, petitioners could achieve that goal by restructuring their business to facilitate greater tax deductions. CPS explained:

---

[4] On their 2014 Schedule C petitioners reported gross receipts of $897,133 and net profit of $619,505.

[5] CPS stated in the Plan: "We have reviewed your situation, and we have reviewed your 1040 income tax return for 2013. Additionally we personally met and discussed your situation. You are married. You have 2 children. The children work in the business."

5

[*5]  [M]arginal rates are important for measuring income tax saving from deductions.  The marginal rate is the rate applied to the last Dollar [sic] earned.  If a deduction can be created, that deduction will create income tax savings at the marginal rate. So if your marginal rate is 48.40%, for each $100 of deduction created, tax savings of $48 will occur.

In accordance with the above strategy, CPS advised petitioners to (1) convert K J Marketing to an S corporation and (2) rent their residential properties to the S corporation "for business purposes at a reasonable per day rate supported by independent comparables." Under the Plan, the S corporation would rent each of petitioners' residential properties for a maximum of 14 days and deduct that expense on its income tax return.  Petitioners, in turn, would exclude their corresponding rental income pursuant to section 280A(g).

CPS included a tax saving projection in the Plan.  For purposes of that projection, CPS "assumed" that one of the residential properties had a per-day rental rate of $2,500 and that each of the other three properties had a per-day rental rate of $2,000.  Despite those assumptions, CPS warned petitioners that the rental rates "should be supported by independent comps [sic] within a 100 mile radius."  CPS also suggested that petitioners retain a professional appraiser to value the rental rate every three years.

Another component of the Plan was the creation of a C corporation, which would provide "marketing" services to the S corporation.  Under the Plan, the S corporation would pay the C corporation a yearly marketing fee, which "should not exceed more than 10%" of the S corporation's gross income.  The C corporation, in turn, would pay and deduct on its income tax returns the following expenses:  (1) deferred compensation plan payments, (2) tuition for petitioners' sons, (3) medical expenses and disability plans for petitioners' family, (4) overtime and weekend meals for the employees, (5) meals for petitioners' family "for the convenience of the employer," and (6) salaries to petitioners' children.  As for the nature of the marketing services, the Plan states: "The C Corporation should pay for marketing expenses for the benefit of the Operating Entity [the S corporation].  These expenses may be for items such as promotional materials and little league sponsorships showing that this company is very active."

[*6]    The Plan also includes an unsigned legal opinion from attorney T. Walton Dallas,[6] stating: "We have determined that in the event that the taxpayer is challenged by the IRS, it is more likely than not that the taxpayer will be entitled to the income tax benefits described" in the Plan.  That conclusion, however, had several caveats.  For one, Mr. Dallas gave "no opinion as to the fair market value of any item for any deduction or credit taken."  Mr. Dallas also made "no representation as to the reasonableness of any item" and "assumed there is a substantial and proper business purpose for each component of the tax plan, the structure of any entities, and the participation of any persons."

*KJJJ Marketing, Inc.*

In December 2014 petitioners organized KJJJ Marketing, Inc. (KJJJ), under the laws of Texas.  Petitioners used KJJJ to conduct the business they had previously done as K J Marketing.  Petitioner wife was the sole owner of KJJJ, which elected to be treated as an S corporation for income tax purposes.  During 2015, 2016, and 2017, Veerendra and Arjun were employees of KJJJ.[7]

Before engaging CPS, petitioner husband used hotels and restaurants to conduct business meetings for K J Marketing.  In 2014 petitioners moved those meetings to the Daphne, Birmingham, Mobile, and Spring Properties.  After KJJJ's incorporation, petitioners began charging rent to the S corporation for the use of those properties.  Pursuant to the Plan, KJJJ rented each of their residential properties for a maximum of 14 days.  In 2014 petitioners invoiced KJJJ as follows:

| Property | Daily rental rate | Days rented | Total rent |
|---|---|---|---|
| Daphne | $2,500 | 14 | $35,000 |
| Birmingham | 2,000 | 14 | 28,000 |
| Mobile | 2,000 | 14 | 28,000 |
| Spring | 2,000 | 14 | 28,000 |
| **Total** | | | $119,000 |

[6] CPS disclosed that Mr. Dallas (or his family) had a financial interest in its tax planning business and advised petitioners to ask their tax return preparer or separate legal counsel to review the Plan.  Although Mr. Dallas is listed as one of petitioners' counsel, he did not participate in the trial of this case.  Petitioners also signed a conflict waiver, which we admitted into evidence at trial.  *See* Rule 24(g)(1).

[7] As of the trial date, Veerendra was still a fulltime employee of KJJJ.

[*7] In 2015 petitioners invoiced KJJJ as follows:

| Property | Daily rental rate | Days rented | Total rent |
|---|---|---|---|
| Daphne | $2,500 | 14 | $35,000 |
| Mobile | 2,000 | 14 | 28,000 |
| Spring | 2,000 | 14 | 28,000 |
| **Total** | | | $91,000 |

In 2016 petitioners invoiced KJJJ as follows:

| Property | Daily rental rate | Days rented | Total rent |
|---|---|---|---|
| Daphne | $2,500 | 14 | $35,000 |
| **Total** | | | $35,000 |

In 2017 petitioners invoiced KJJJ as follows:

| Property | Daily rental rate | Days rented | Total rent |
|---|---|---|---|
| Daphne | $2,500 | 14 | $35,000 |
| Spring | 2,000 | 14 | 28,000 |
| **Total** | | | $63,000 |

Petitioners did not obtain any appraisals of their properties for purposes of valuing the above-described daily rental rates. Instead they used the rates CPS had assumed for purposes of making a tax saving projection in the Plan.

*JYJ Marketing, Inc.*

In November 2014 petitioners incorporated their new "marketing" company, JYJ Marketing, Inc. (JYJ), pursuant to the Plan. Organized as a C corporation under the laws of Texas, JYJ issued 4 shares of stock to petitioner husband, 48 shares to an unrelated individual, and 48 shares to another unrelated individual.[8] Petitioners, Veerendra, and Arjun (collectively, Jadhav family) were appointed directors and part-time employees of JYJ. At the initial meeting of shareholders and directors, the Jadhav family in their capacity as

---

[8] In the Plan, CPS advised petitioners against owning more than 50% of the C corporation for reasons not relevant to the resolution of this case. CPS recommended that petitioners find two unrelated individuals to hold 96% of the C corporation's shares.

[*8] directors adopted several plans for the benefit of JYJ's employees, including plans for (1) medical expense reimbursement, (2) overtime and weekend meal reimbursement, (3) meals furnished for the convenience of the employer, (4) mileage, (5) dwelling unit leasing, (6) tuition, and (7) fitness and country club expenses.

With respect to JYJ's marketing activities, the minutes from the initial board meeting state:

> A new Marketing Company has been formed and marketing activities are allocated by written agreement to the new Marketing Company. The Marketing Company conducts marketing events at the house of the Employee. Also employee meetings are now being held at the house of the Employee.
>
> As the marketing activities are being conducted by a separate legal entity, the Operating Company is not liable for those activities. This allows more marketing events to be conducted as the Operating Company will be free from liqueur liability and slip and fall liability.
>
> While all marketing decisions were made at the Operating Company level, now those decisions are being made at the Marketing Company level.

During the years in issue, KJJJ made yearly payments to JYJ for purported marketing services. The marketing fees were JYJ's only source of income. KJJJ paid JYJ as follows:

|  | *2014* | *2015* | *2016* | *2017* |
|---|---|---|---|---|
| *Marketing fee* | $190,000 | $170,000 | $150,000 | $110,000 |

JYJ used the marketing fees to pay several personal expenses of the Jadhav family. It did not use any portion of the funds to pay KJJJ's marketing expenses. Nor did it host marketing or promotional events on KJJJ's behalf, as the minutes of the initial board meeting had envisioned.

*Tax reporting*

Kenneth Walker, a certified public accountant (CPA), prepared petitioners' joint Forms 1040, U.S. Individual Income Tax Return, for the years in issue. Petitioners' 2014 Form 1040 includes a Schedule C

**[*9]** for K J Marketing. On that Schedule C petitioners claimed as a pension and profit sharing deduction their $46,850 contribution to their sons' section 401(k) accounts. They also claimed a deduction of $68,063 for travel expenses.

Petitioners selected Mr. Walker on a friend's recommendation. They provided their new CPA information about the Plan and the organizational changes to their business. After telling petitioner husband that he understood the Plan, Mr. Walker prepared income tax returns for KJJJ and JYJ.

KJJJ filed Forms 1120S, U.S. Income Tax Return for an S Corporation, for the years in issue. For each year in issue, KJJJ deducted the rent petitioners had invoiced. We summarize KJJJ's deductions for rent below:

|  | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|
| *Rent* | $119,000 | $103,500[9] | $35,000 | $63,000 |

KJJJ also claimed "other" deductions as follows:

|  | *2014* | *2015* | *2016* | *2017* |
|---|---|---|---|---|
| *Application fees* | $125 | — | — | — |
| *Insurance expense* | 165,195 | $129,420 | $106,197 | $98,800 |
| *Marketing fees* | 190,000 | 170,000 | 150,000 | 150,000[10] |
| *Conference expenses* | — | 4,800 | 5,080 | — |
| *Contract labor* | — | 11,200 | 5,800 | — |
| *Gifts* | — | 7,600 | 3,600 | 3,600 |
| *Mileage reimbursement* | — | 26,104 | 18,722 | 20,627 |
| *Office supplies* | — | 43,700 | 22,890 | 8,250 |
| *Payroll processing fees* | — | 657 | 1,274 | — |
| *Product development* | — | 32,400 | 15,900 | — |
| *Professional fees* | — | 12,994 | 9,743 | 3,040 |
| *Travel* | — | 17,125 | 11,311 | 23,964 |

---

[9] For 2015 KJJJ's deduction for rent comprised $91,000 for the use of petitioners' properties and $12,500 for the use of a mud pump. Respondent concedes on brief that petitioners are entitled to a flowthrough deduction of $12,500 for the mud pump rental.

[10] There is a discrepancy between the reported marketing fee of $150,000 and the amount petitioners have substantiated, $110,000. We find that KJJJ paid JYJ $110,000 in purported marketing fees in 2017.

| [*10]  *Total* | $355,320 | $456,000 | $350,517 | $308,281 |
|---|---|---|---|---|

After deducting its reported expenses, KJJJ reported ordinary business income of $10,945, $247,592, $104,944, and $268,563 for 2014, 2015, 2016, and 2017, respectively. Petitioners reported those amounts on their Schedules E, Supplemental Income and Loss, for the years in issue. Petitioners also reported their rental income from KJJJ on their Schedules E but treated those amounts as excludable pursuant to section 280A(g).

JYJ reported the marketing fees it had received from KJJJ on Forms 1120, U.S. Corporation Income Tax Return, for its taxable years ending November 30, 2015, 2016, 2017, and 2018.[11] Besides the marketing fees from KJJJ, JYJ did not report any income. It did not claim any deductions for officer compensation or wages but deducted several personal expenses of the Jadhav family including (1) out-of-pocket medical bills, (2) meals and entertainment, (3) petitioner husband's mileage, (4) portions of Arjun's and Veerendra's tuition, (5) petitioners' health club membership, and (6) lawn care.[12]

*Examination*

In 2017 the Internal Revenue Service selected petitioners', KJJJ's, and JYJ's returns for examination and assigned the case to Revenue Agent (RA) Kendria Vickers. With respect to KJJJ's Forms 1120S, RA Vickers fully disallowed the S corporation's rent deductions for the years in issue. She also disallowed almost all of KJJJ's "other" deductions. Of those items, only KJJJ's reported marketing fees and travel expenses remain at issue.[13]

In a civil penalty approval form dated October 31, 2018, RA Vickers made an initial determination to assert accuracy-related

---

[11] On its initial Form 1120, JYJ elected a taxable year ending November 30.

[12] CPS advised petitioners to treat the C corporation's payment of several personal expenses as nontaxable fringe benefits, and petitioners appear to have employed that strategy. Respondent has not challenged petitioners' treatment of the JYJ payments, so we need not address them further.

[13] RA Vickers allowed KJJJ's 2014 deduction for application fees and its 2015 and 2016 deductions for payroll processing fees. In the Stipulation of Settled Issues, respondent conceded that KJJJ may deduct its reported insurance expenses for the years in issue. Meanwhile, petitioners conceded that KJJJ is not entitled to deductions for conference expenses, contract labor, gifts, mileage reimbursement, office supplies, product development, and professional fees.

[*11] penalties for underpayments due to substantial understatements of income tax for the years in issue. RA Vickers's then-immediate supervisor, Acting Group Manager Angela Harris, signed the civil penalty approval form on October 31, 2018.

On April 26, 2019, respondent issued petitioners two statutory notices of deficiency (SNODs) determining deficiencies and section 6662(a) accuracy-related penalties for the years in issue.[14] Respondent increased petitioners' passthrough income for the years in issue after making the above-described adjustments to KJJJ's rental and "other" deductions. Because of clerical errors, however, the SNODs understate RA Vickers' intended adjustments to petitioners' passthrough income for 2015, 2016, and 2017.

Respondent also made adjustments to petitioners' 2014 Schedule C in the SNOD for that year. Therein respondent disallowed petitioners' Schedule C deductions for travel and pension and profit sharing expenses.

With respect to JYJ, respondent did not determine any deficiencies against the corporation. Instead, respondent treated JYJ's 2015, 2016, and 2017 Forms 1120 as "sham" returns. Respondent refunded the amounts JYJ had paid as tax for those years.

*Proceedings in this Court*

In response to the SNODs, petitioners timely petitioned this Court, and respondent filed an Answer. Thereafter respondent filed a Motion for Leave to File an Amended Answer, in which he asserted increased deficiencies and accuracy-related penalties for 2015 and 2016 on the basis of the above-described clerical errors. Petitioners had no objection to the Motion, which we granted.

This case was set for remote trial at the Court's October 13, 2020, Winston-Salem, North Carolina, trial session. On September 22, 2020, respondent filed a Pretrial Memorandum. Therein respondent asserted an increased deficiency and accuracy-related penalty for 2017. Respondent's counsel explained that he had recently discovered a clerical error in the 2017 SNOD, the correction of which would increase the deficiency and accuracy-related penalty for that year. Although petitioners stipulated a revised computation for 2017, at trial they

---

[14] The first SNOD covers 2014, 2015, and 2016; the second covers 2017.

**[*12]** objected to the increased deficiency for that year. After trial respondent filed a Motion for Leave to File Second Amended Answer to Conform Pleadings to Proof (Motion for Leave), to which petitioners objected.

## OPINION

I.     *Respondent's Motion for Leave*

Respondent moved under Rule 41(b) to amend his pleading to conform to the evidence submitted at trial. Respondent lodged with his Motion a Second Amended Answer asserting an increased deficiency and accuracy-related penalty for 2017. Respondent alleges that he failed to account for KJJJ's reported ordinary business income of $268,563 in calculating petitioners' corrected passthrough income. Respondent attributes that failure to a clerical error, the correction of which would increase petitioners' deficiency from $50,727 to $157,078 and accuracy-related penalty from $10,145.40 to $31,415.40.

This Court has held on numerous occasions that it will not consider issues which have not been properly pleaded or otherwise preserved. *Markwardt v. Commissioner*, 64 T.C. 989, 997 (1975). Nevertheless, Rule 41(b) provides a procedure whereby the pleadings may be amended to conform to the evidence presented at trial in appropriate circumstances. Rule 41(b) provides in part:

> (1) *Issues Tried by Consent*: Issues not raised by the pleadings but tried by express or implied consent of the parties are treated in all respects as if raised in the pleadings. The Court, on motion of any party at any time, may allow any amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues, but failure to amend does not affect the result of the trial of these issues.

> (2) *Other Evidence*: If a party objects to evidence on the ground that it is not within the issues raised by the pleadings, the Court may receive the evidence and at any time allow the pleadings to be amended to conform to the proof. The Court will do so freely when justice so requires and the objecting party fails to satisfy the Court that the admission of the evidence will prejudice that party's position on the merits.

**[\*13]** This Court, in deciding whether an issue was tried by implied consent within the meaning of Rule 41(b)(1), has considered whether the consent results in unfair surprise or prejudice to the consenting party and prevents that party from presenting evidence that might have been introduced if the issue had been timely raised. *Phillips v. Commissioner*, T.C. Memo. 2013-215, at \*9–10; *Bulas v. Commissioner*, T.C. Memo. 2011-201, 2011 Tax Ct. Memo LEXIS 202, at \*2 n.2. When a party objects to the evidence relating to issues that the other party seeks to raise by amending a pleading, Rule 41(b)(2) determines whether an amendment to a pleading should be allowed. An amendment is to be allowed under Rule 41(b)(2) only if (1) "justice so requires" and (2) the amendment would not prejudice the objecting party in maintaining his or her position on the merits. *See Phillips*, T.C. Memo. 2013-215, at \*9–10.

Allowing respondent to amend his Answer would not unfairly surprise or prejudice petitioners. Approximately three weeks before trial, respondent filed a Pretrial Memorandum disclosing the above-described clerical error and asserting an increased deficiency and accuracy-related penalty. Petitioners were therefore on notice of the increased deficiency and penalty and had ample opportunity to plan a defense to those increases. Petitioners have neither claimed nor shown that they would have prepared differently for trial had respondent amended his Answer sooner.

Although petitioners objected to the increased deficiency and penalty, they did not make any related evidentiary objections. To the contrary, they stipulated a revised computation of the 2017 deficiency. Even if they had reserved an objection to that Exhibit, justice would require allowing the amendment. Respondent is attempting to correct a clerical error that he discovered and disclosed several weeks before trial. The substantive issues in the case—petitioners' and/or KJJJ's deductions for pension contributions, travel expenses, rent, and marketing fees—are unchanged by respondent's proposed amendment. We will therefore grant respondent's Motion for Leave and allow respondent to assert an increased deficiency and penalty for 2017.

II. *Burden of proof*

The Commissioner's determination of a deficiency in tax is presumptively correct. *Welch v. Helvering*, 290 U.S. 111, 115 (1933). Generally, the burden of proof is on the taxpayer to show that the Commissioner has erred in his determination. Rule 142(a)(1). That

**[\*14]** presumption, however, applies only to the determinations in the notice of deficiency. If the Commissioner asserts an increased deficiency or new matter after the notice of deficiency is issued, then the burden of proof as to the increased deficiency or new matter is on him. *Id.*; *Wayne Bolt & Nut Co. v. Commissioner*, 93 T.C. 500, 507 (1989).

Where the increase in deficiency is based on a clerical or mathematical error in the notice of deficiency, the Commissioner bears only the burden of establishing the clerical or mathematical error. *Raquet v. Commissioner*, T.C. Memo. 1996-279, 1996 Tax Ct. Memo LEXIS 293, at \*10. The taxpayer retains the burden with regard to the Commissioner's determinations. *Id.* at \*10–11 (first citing *Estate of Applestein v. Commissioner*, 80 T.C. 331, 347 n.5 (1983); then citing *Beck Chem. Equip. Corp. v. Commissioner*, 27 T.C. 840, 856 (1957); then citing *Kiehl v. Commissioner*, T.C. Memo. 1986-54; and then citing *Holtz v. Commissioner*, T.C. Memo. 1982-436).

In his First and Second Amended Answers, respondent asserts increased deficiencies and accuracy-related penalties for 2015, 2016, and 2017 on the ground that the SNODs contain clerical errors for those years. In his Simultaneous Opening Brief, respondent described those errors and directed the Court to several Exhibits showing how they occurred. Besides disputing respondent's Motion for Leave, petitioners did not address the clerical errors on brief. They have therefore conceded that the errors in the SNODs are clerical. *See Mendes v. Commissioner*, 121 T.C. 308, 312–13 (2003) (holding that arguments not addressed in posttrial brief may be considered abandoned); *Leahy v. Commissioner*, 87 T.C. 56, 73–74 (1986) (finding concession by failure to argue). Thus, having established clerical errors in the SNODs for 2015, 2016, and 2017, respondent has met his burden as to the increased deficiencies. *See Raquet*, T.C. Memo. 1996-279.

With respect to respondent's determinations in the SNODs, we decide this case on the preponderance of the evidence. Accordingly, we need not further allocate the burden of proof as to the expense items at issue.[15] *See Estate of Turner v. Commissioner*, 138 T.C. 306, 309 (2012).

---

[15] Section 7491(a) provides that if, in any court proceeding, a taxpayer introduces credible evidence with respect to any factual issue relevant to ascertaining the liability for tax and meets other prerequisites, the burden of proof rests on the Commissioner as to that factual issue. *See Higbee v. Commissioner*, 116 T.C. 438, 440–

**[\*15]** III.    *Deductions*

Section 162(a) allows a deduction for ordinary and necessary expenses paid or incurred during the taxable year in carrying on a trade or business.

Deductions are a matter of legislative grace, and a taxpayer generally bears the burden of proving that he or she is entitled to the deduction claimed.  *See INDOPCO, Inc. v. Commissioner*, 503 U.S. 79, 84 (1992); *New Colonial Ice Co. v. Helvering*, 292 U.S. 435, 440 (1934). The taxpayer is required to maintain records that are sufficient to enable the Commissioner to determine the correct tax liability.  *See* § 6001; Treas. Reg. § 1.6001-1(a).  The taxpayer must demonstrate that the deduction is allowable pursuant to a statutory provision and must further substantiate that the expense to which the deduction relates has been paid or incurred.  *See* § 6001; *Hradesky v. Commissioner*, 65 T.C. 87, 89–90 (1975), *aff'd per curiam*, 540 F.2d 821 (5th Cir. 1976); *Hershberger v. Commissioner*, T.C. Memo. 2014-63, at \*7–8.

If the taxpayer can establish that he or she paid or incurred a deductible expense but cannot substantiate the precise amount, the Court may approximate the deductible amount of the expense.  *See Cohan v. Commissioner*, 39 F.2d 540, 543–44 (2d Cir. 1930).  However, the taxpayer must present sufficient evidence to establish a rational basis for making the estimate. *See id.*; *Vanicek v. Commissioner*, 85 T.C. 731, 742–43 (1985).

A.    *2014 Schedule C*

1.    *Pension and profit-sharing expense*

On their 2014 Schedule C petitioners deducted as a pension and profit-sharing expense their $46,850 contribution to Arjun's and Veerendra's section 401(k) accounts.    Disputing the deduction,

---

41 (2001).  Petitioners have not argued that they satisfied the requirements of section 7491(a) to shift the burden of proof to respondent.

In their Simultaneous Answering Brief, petitioners suggested that respondent's argument regarding KJJJ's rent deductions was a new matter, which would shift the burden of proof to respondent. *See Wayne Bolt & Nut Co.*, 93 T.C. at 507.  Because we decide this case on the preponderance of the evidence, we need not resolve this issue.

**[\*16]** respondent contends that neither Arjun nor Veerendra was an employee of petitioners in 2014.

Section 404(a) allows an employer to deduct certain contributions to deferred compensation plans that are paid or accrued on account of an employee. *Gaston v. Commissioner*, T.C. Memo. 2021-107, at \*26. Whether an employer-employee relationship exists is a question of fact. *Air Terminal Cab, Inc. v. United States*, 478 F.2d 575, 578 (8th Cir. 1973); *Pro. & Exec. Leasing, Inc. v. Commissioner*, 89 T.C. 225, 232 (1987), *aff'd*, 862 F.2d 751 (9th Cir. 1988). Courts typically apply a common law agency test to determine whether an employer-employee relationship exists. *See, e.g.*, *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323–24 (1992); *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 751–52 (1989); *Matthews v. Commissioner*, 92 T.C. 351, 360 (1989), *aff'd*, 907 F.2d 1173 (D.C. Cir. 1990). Moreover, where a family relationship is involved, close scrutiny is required to determine whether a bona fide employer-employee relationship existed and whether payments were made on account of the employer-employee relationship or on account of the family relationship. *See Denman v. Commissioner*, 48 T.C. 439, 450 (1967); *Haeder v. Commissioner*, T.C. Memo. 2001-7, 2001 Tax Ct. Memo LEXIS 6; *Shelley v. Commissioner*, T.C. Memo. 1994-432.

In determining whether a person is an employee under the general common law of agency, we consider several nonexclusive factors.[16] *See Nationwide Mut. Ins. Co.*, 503 U.S. at 323–24; *NLRB v. United Ins. Co. of Am.*, 390 U.S. 254, 258 (1968); *Pro. & Exec. Leasing, Inc.*, 89 T.C. at 232. Inevitably cases turn on the particular facts of each case, and no one factor is controlling. *See Pro. & Exec. Leasing, Inc.*, 89 T.C. at 232.

At trial petitioner husband credibly testified that he viewed K J Marketing (which later became KJJJ) as a family business. He also credibly testified that he wished to pass his business on to Veerendra

---

[16] This Court has enumerated the following factors in determining whether an employer-employee relationship exists: (1) the degree of control exercised by the principal over the details of the work; (2) which party invests in the facilities used in the work; (3) the opportunity of the individual for profit or loss; (4) whether the principal has the right to discharge the individual; (5) whether the work is part of the principal's regular business; (6) the permanency of the relationship; and (7) the relationship the parties believe they are creating. *Weber v. Commissioner*, 103 T.C. 378, 387 (1994), *aff'd per curiam*, 60 F.3d 1104 (4th Cir. 1995); *Pro. & Exec. Leasing, Inc.*, 89 T.C. at 232; *Simpson v. Commissioner*, 64 T.C. 974, 984–85 (1975).

17

[*17] and Arjun. The record establishes that petitioners pursued that goal. Although Veerendra and Arjun were in college in 2014, petitioner husband credibly recounted assigning them research tasks and overseeing their work while they were in school. Upon KJJJ's incorporation, Veerendra and Arjun became employees of the S corporation, which issued them Forms W–2, Wage and Tax Statement, for 2015, 2016, and 2017. Veerendra was a full-time employee of KJJJ at the time of trial. These facts support a finding of an employment relationship, as they demonstrate petitioner husband's control over his sons' work, his investment in the business, a lengthy employment relationship, and an intention to create an employer-employee relationship.

Respondent does not appear to dispute the classification of Veerendra and Arjun as employees—at least not for 2015, 2016, and 2017. Rather, respondent disputes the timing of their employment, asserting that it did not commence in 2014. In support of his contention, respondent cites petitioners' failure to file Forms W–2 for 2014. To be sure, the failure to file information returns may undermine the assertion of a bona fide employer-employee relationship. *See Haeder*, 2001 Tax Ct. Memo LEXIS 6, at *33. In this case, however, petitioner husband's credible testimony is supported by contemporaneous evidence in the trial record. The Plan, which was prepared in 2014, states: "You [petitioner husband] have 2 children. The children work in the business." Thus, under the particular circumstances of this case, we find it more likely than not that Arjun and Veerendra were petitioners' employees in 2014.[17]

Respondent does not dispute petitioners' pension and profit-sharing deduction on any ground besides Arjun's and Veerendra's

---

[17] Respondent contends that Veerendra and Arjun were absent from trial and that he is entitled to a presumption that their testimony would be unfavorable to petitioners. *See Wichita Terminal Elevator Co. v. Commissioner*, 6 T.C. 1158, 1165 (1946), *aff'd*, 162 F.2d 513 (10th Cir. 1947). But where both parties have equal access to the evidence, we do not apply an adverse inference. *Jordan v. Commissioner*, 134 T.C. 1, 10 (2010), *supplemented by* T.C. Memo. 2011-243. Respondent could have subpoenaed Veerendra and Arjun; thus both parties had equal access to the potential witnesses. We therefore decline to draw a negative presumption against petitioners on this issue. Even if we did, we would still find that the weight of the evidence favors petitioners here. *See Diaz v. Commissioner*, 58 T.C. 560, 564 (1972) (observing that the process of distilling truth from the testimony of witnesses, whose demeanor we observe and whose credibility we evaluate, "is the daily grist of judicial life").

**[*18]** employment statuses. Having resolved that factual issue in petitioners' favor, we hold that petitioners are entitled to the deduction.

2.     *Travel expenses*

On their 2014 Schedule C petitioners claimed a deduction of $68,063 for travel expenses. Respondent argues that petitioners have not substantiated these reported expenses.

The strict substantiation requirements of section 274(d) apply to travel expenses. Under section 274(d), the taxpayer generally must substantiate either by adequate records or by sufficient evidence corroborating the taxpayer's own statement (1) the amount of the expense; (2) the time and place the expense was incurred; (3) the business purpose of the expense; and (4) in the case of an entertainment or gift expense, the business relationship to the taxpayer of each expense incurred. For listed property expenses, the taxpayer must establish the amount of business use and the amount of total use for the property. *See* Temp. Treas. Reg. § 1.274-5T(b)(6)(i)(B).

Substantiation by adequate records requires the taxpayer to maintain an account book, a diary, a log, a statement of expense, trip sheets, or a similar record prepared contemporaneously with the expenditure and documentary evidence (e.g., receipts or bills) of certain expenditures. Treas. Reg. § 1.274-5(c)(2)(iii); Temp. Treas. Reg. § 1.274-5T(c)(2). Substantiation by other sufficient evidence requires the production of corroborative evidence in support of the taxpayer's statement specifically detailing the required elements. Temp. Treas. Reg. § 1.274-5T(c)(3).

In support of their deduction for travel expenses, petitioners submitted reconstructions of purported travel logs and odometer readings. However, the record does not contain any documentary evidence or other direct or circumstantial evidence of the time, location, and business purpose of each reported travel expense. Petitioners' failure to produce such evidence (which one would expect to be in their exclusive possession or control) creates a presumption that it would not be favorable to them. *See Wichita Terminal Elevator Co.*, 6 T.C. at 1165. In the light of that presumption, and considering petitioners' failure to establish by adequate records or other sufficient evidence each element of their reported travel expenses, petitioners have not met the requirements of section 274(d). We sustain respondent's determination on this issue.

[*19]  B.      *2014–17 Forms 1120S (KJJJ)*

We next consider whether respondent properly disallowed KJJJ's deductions for marketing fees, rent, and travel expenses.[18]

1.      *Marketing fees*

For the years in issue, KJJJ claimed deductions for marketing fees in accordance with the Plan.  Having fully disallowed those deductions, respondent contends that the marketing fees were not ordinary and necessary under section 162.  We agree.

To be "necessary" within the meaning of section 162, an expense needs to be "appropriate and helpful" to the taxpayer's business.  *Welch v. Helvering*, 290 U.S. at 113.  The requirement that an expense be "ordinary" connotes that "the transaction which gives rise to it must be of common or frequent occurrence in the type of business involved." *Deputy v. DuPont*, 308 U.S. 488, 495 (1940).

Having carefully reviewed the record, we are doubtful that the marketing fees were ordinary and necessary.  The creation of JYJ was one of the tax reduction strategies CPS had recommended in the Plan.  Pursuant thereto, KJJJ made large annual payments to JYJ, of which petitioners were shareholders and directors.  JYJ did not make any marketing expenditures for KJJJ, as CPS had suggested it would in the Plan.  Nor did JYJ host meetings on KJJJ's behalf, as envisioned in JYJ's initial board minutes.  Nevertheless, KJJJ paid large yearly sums to JYJ, which, in turn, used those sums to pay the personal expenses of the Jadhav family.  In the light of these facts, we find it more likely than not that JYJ did not provide ordinary and necessary marketing services to KJJJ.

---

[18] If a business meets the requirements of section 1361, it may elect to be treated as an S corporation and generally avoid corporate tax.  §§ 1362(a), 1363(a).  An S corporation, like a partnership, is a flowthrough entity; its income and losses flow through to its shareholders, who then pay income tax.  *See* § 1363(b). Section 1366(a)(1) provides that an S corporation shareholder determines his or her tax liability by taking into account his or her pro rata share of the S corporation's income, losses, deductions, and credits for the S corporation's taxable year ending with or in the shareholder's taxable year.  We have jurisdiction to redetermine the deductions claimed by KJJJ. *See Winter v. Commissioner*, 135 T.C. 238 (2010); *Berry v. Commissioner*, T.C. Memo. 2018-143, at *6, *aff'd*, 828 F. App'x 431 (9th Cir. 2020); *Alli v. Commissioner*, T.C. Memo. 2014-15, at *17 n.11.

**[\*20]** Acknowledging that JYJ did not provide traditional marketing services to KJJJ, petitioners nevertheless contend that the fees were ordinary and necessary for purposes of risk mitigation. At trial petitioner husband testified that he used JYJ to develop new ideas, many of which would fail. According to petitioner husband, JYJ shielded KJJJ from the reputational risk of such failures. Petitioner husband testified that once an idea proved viable, KJJJ would market it to potential users. Although we found petitioner husband credible, he did not explain how the marketing fees were determined. It is also unclear from the record whether JYJ developed any ideas that warranted KJJJ's payments of large annual marketing fees. The invoices in the record are vague, stating only that JYJ provided "[m]arketing and sale promotion."

This Court has upheld disallowances of section 162 deductions in similar circumstances. For instance, in *ASAT, Inc. v. Commissioner*, 108 T.C. 147, 174–75 (1997), we held that the taxpayer was not entitled to deduct consulting fees it had paid to an unrelated corporation where the taxpayer did not establish how the fees were determined, there was no written contract, the invoices provided almost no detail, and there was no evidence of the service provider's skills that might warrant the consulting fees. *See also Weekend Warrior Trailers, Inc. v. Commissioner*, T.C. Memo. 2011-105 (sustaining the Commissioner's disallowance of management fee deduction where the evidence did not adequately establish the specific services performed and who performed them). For similar reasons, we hold that JYJ is not entitled to the marketing fee deductions for the years in issue. We sustain respondent's determination on this issue.

2. *Rent*

KJJJ also claimed deductions for rent paid to petitioners for the use of their residential properties during the years in issue. Having fully disallowed those deductions, respondent contends that KJJJ's reported rental expenses were not ordinary and necessary.[19] *See* § 162. We agree.

Section 162 permits a taxpayer to deduct all ordinary and necessary expenses paid during the taxable year in carrying on its trade or business, including "rentals or other payments required to be made as a condition to the continued use or possession" of property.

_____

[19] Respondent also contends that petitioners failed to substantiate some of the reported rent payments. Because we sustain respondent's determination on other grounds, we need not resolve this issue.

**[\*21]** § 162(a)(3). In determining whether the payments in issue are deductible under section 162, the basic question is whether the payments were in fact rent and not something else disguised as rent. *Accord Levenson & Klein, Inc. v. Commissioner*, 67 T.C. 694, 715 (1977); *see Place v. Commissioner*, 17 T.C. 199, 203 (1951), *aff'd per curiam*, 199 F.2d 373 (6th Cir. 1952). This is a question of fact, "and the character of the payments in question is to be judged in light of (1) all the terms and conditions of the agreement establishing the obligation to pay and (2) all the facts and circumstances existing at the time the agreement was made." *Audano v. United States*, 428 F.2d 251, 256 (5th Cir. 1970); *see Brown Printing Co. v. Commissioner*, 255 F.2d 436, 440 (5th Cir. 1958), *rev'g* T.C. Memo. 1957-37.

Only the portion of an expense that is reasonable qualifies for deduction under section 162(a). *United States v. Haskel Eng'g & Supply Co.*, 380 F.2d 786, 788–89 (9th Cir. 1967); *see also Fuhrman v. Commissioner*, T.C. Memo. 2011-236, 2011 Tax Ct. Memo LEXIS 230, at \*6. The reasonableness concept has particular significance in determining whether payments between related parties represent ordinary and necessary expenses. *See Fuhrman*, 2011 Tax Ct. Memo LEXIS 230, at \*6–7 (citing Boris I. Bittker & Lawrence Lokken, *Federal Taxation of Income, Estates, and Gifts*, para. 20.1.5, at 20-18 (3d ed. 1999)). Because petitioners wholly owned KJJJ, we must consider whether the rental arrangement between the two was reasonable.

Having carefully reviewed the record, we find it more likely than not that KJJJ's payments to petitioners were unreasonable and something other than rent. Petitioners' rental arrangement with KJJJ was another tax reduction strategy CPS had suggested in the Plan. In making that suggestion, CPS advised petitioners to use a reasonable rental rate supported by independent comparables. CPS also suggested that petitioners retain a professional appraiser to determine fair rental values for their properties. Petitioners did not follow that advice. Instead they charged KJJJ the daily rental rates CPS had assumed in its tax saving projection. Although petitioners contend that those rates were based on independent comparables, no such comparables appear in the record.[20] Their absence creates a presumption that they would be

---

[20] Petitioners' contention also conflicts with Mr. Dallas's legal opinion, which disclaims any opinion "as to the fair market value of any item for any deduction or credit taken."

22

**[\*22]** unfavorable to petitioners. *See Wichita Terminal Elevator Co.*, 6 T.C. at 1165.

Petitioners contend that respondent's full disallowance of KJJJ's rent deductions was arbitrary and capricious. According to petitioners, some portion of the rent must be deductible because the residential properties have fair rental values greater than zero. However, as explained above, the record establishes that KJJJ's rental arrangement with petitioners was not reasonable. While we may approximate a fair rental value in appropriate circumstances, *see Cohan v. Commissioner*, 39 F.2d at 543–44; *Clem v. Commissioner*, T.C. Memo. 1991-414, 1991 Tax Ct. Memo LEXIS 463, at \*17 ("[B]ased upon the well-established *Cohan* rule and its reasoning, we have done our best to approximate a reasonable fair market value."), we must have some basis upon which to make an estimate, *Vanicek*, 85 T.C. at 742–43. Petitioners have not provided any expert testimony or other evidence of their properties' fair rental values. Accordingly, we are unable to conclude that any portion of KJJJ's reported rent was reasonable and, in turn, ordinary and necessary. We therefore sustain respondent's determination on this issue.

### 3. *Travel expenses*

On its Forms 1120S, KJJJ deducted $17,125, $11,311, and $23,964 for 2015, 2016, and 2017, respectively. Respondent contends that petitioners have not substantiated KJJJ's reported travel expenses.

To substantiate those expenses, petitioners submitted reconstructed travel logs. For the reasons stated *supra* Part III.A.2, we sustain respondent's determination on this issue.

## IV. *Accuracy-related penalties*

Finally we consider whether petitioners are liable for accuracy-related penalties for the years in issue. Section 6662(a) imposes a penalty equal to 20% of any underpayment that arises from a substantial understatement of income tax. *See* § 6662(b)(2). An understatement is substantial if it exceeds the greater of 10% of the correct tax or $5,000. § 6662(d)(1)(A). Respondent contends that there is a substantial understatement of income tax for each year in issue.

Generally, the Commissioner bears the initial burden of production of establishing via sufficient evidence that a taxpayer is liable for penalties and additions to tax; once this burden is met, the

**[\*23]** taxpayer must carry the burden of proof with regard to defenses such as reasonable cause. *See* § 7491(c); *Higbee*, 116 T.C. at 446–47. However, the Commissioner bears the burden of proof with respect to a new penalty or increase in the amount of a penalty asserted in his answer. *See Rader v. Commissioner*, 143 T.C. 376, 389 (2014), *aff'd in part, appeal dismissed in part*, 616 F. App'x 391 (10th Cir. 2015); *see also RERI Holdings I, LLC v. Commissioner*, 149 T.C. 1, 38–39 (2017), *aff'd sub nom. Blau v. Commissioner*, 924 F.3d 1261 (D.C. Cir. 2019); *Bass v. Commissioner*, T.C. Memo. 2023-41, at \*19; *Arnold v. Commissioner*, T.C. Memo. 2003-259, 2003 Tax Ct. Memo LEXIS 258, at \*11–12. As part of the burden of production, the Commissioner must satisfy section 6751(b) by producing evidence of written approval of the penalty by an immediate supervisor, made before formal communication of the penalty to the taxpayer. *See Graev v. Commissioner*, 149 T.C. 485, 493 (2017), *supplementing and overruling in part* 147 T.C. 460 (2016); *see also Clay v. Commissioner*, 152 T.C. 223, 246, 249 (2019), *aff'd*, 990 F.3d 1296 (11th Cir. 2021).

We first address the proportionate increases to the accuracy-related penalties asserted by respondent in the Amended and Second Amended Answers. Respondent's burden includes showing written supervisory approval of the increases pursuant to section 6751(b)(1). *See Dynamo Holdings Ltd. P'ship v. Commissioner*, 150 T.C. 224, 238 (2018); *Bass*, T.C. Memo. 2023-41, at \*20; *Dynamo Holdings Ltd. P'ship v. Commissioner*, T.C. Memo. 2018-61, at \*108. The record does not establish that respondent complied with section 6751(b)(1) in asserting increased penalties in the Amended and Second Amended Answers. Accordingly, respondent has not carried his burden regarding the increased penalties for 2015, 2016, and 2017.

As for the accuracy-related penalties determined in the SNODs, the initial penalty determination was made by RA Vickers on October 31, 2018, and approved in writing by her then-immediate supervisor, Ms. Harris, that same day. Petitioners do not contend that respondent failed to comply with section 6751(b)(1). We therefore find that respondent complied with all procedural requirements to assert the accuracy-related penalty under section 6662(b)(2) for the years in issue. Moreover, petitioners' understatements of income tax likely exceed the greater of 10% of the amount of tax required to be shown on their returns or $5,000. Thus, if the Rule 155 computations show substantial understatements for the years in issue, respondent has satisfied his burden of production with respect to the penalties determined in the SNODs.

[*24] Since respondent likely has met his burden regarding the penalties (as initially determined), petitioners must come forward with persuasive evidence that the penalties are inappropriate. *See* § 7491(c); *Higbee*, 116 T.C. at 446–47. Petitioners may meet their burden by proving that they acted with reasonable cause and in good faith with respect to the underpayments. *See* § 6664(c)(1); *see also Higbee*, 116 T.C. at 447; Treas. Reg. § 1.6664-4(a). The decision as to whether a taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all of the pertinent facts and circumstances. Treas. Reg. § 1.6664-4(b)(1).

"Circumstances that may indicate reasonable cause and good faith include an honest misunderstanding of fact or law that is reasonable in light of all of the facts and circumstances, including the experience, knowledge, and education of the taxpayer." *Id.* Reliance on a tax professional demonstrates reasonable cause when a taxpayer (1) selects a competent tax adviser, (2) supplies the adviser with all relevant information, and (3) relies in good faith on the adviser's professional judgment. *See Neonatology Assocs., P.A. v. Commissioner*, 115 T.C. 43, 99 (2000), *aff'd*, 299 F.3d 221 (3d Cir. 2002).

Citing their reliance on Mr. Walker to prepare their and KJJJ's returns, petitioners assert that they acted with reasonable cause.[21] According to petitioners, Mr. Walker was a qualified CPA who was independent of CPS. Respondent does not dispute those assertions. However, the fact that petitioners hired Mr. Walker to prepare their returns does not, by itself, establish that they acted with reasonable cause and in good faith. *See id.* at 99–100. They must also establish that they supplied him with all relevant information and relied in good faith on his professional judgment. *See id.*

Petitioners have not established that they reasonably relied on Mr. Walker. To be sure, petitioners provided Mr. Walker information about the organizational changes to their business as contemplated by the Plan. However, the record does not establish that petitioners alerted Mr. Walker to the nature of JYJ's purported marketing services, which deviated from those described in the Plan. Nor does the record clearly establish what information, if any, petitioners provided Mr. Walker about their and KJJJ's reported travel expenses, the items petitioners have conceded, and the rental values of their properties. Because

---

[21] Petitioners do not contend that they reasonably relied on Mr. Dallas's opinion letter.

**[\*25]** petitioners have failed to show that they provided Mr. Walker all relevant information, we cannot conclude that their reliance on him was reasonable.

Accordingly, and assuming the Rule 155 calculations confirm substantial understatements of income tax, we sustain respondent's determinations of accuracy-related penalties as reflected in the SNODs. However, we do not sustain respondent's determinations regarding the proportionate increases to the penalties as reflected in the Amended and Second Amended Answers.

In reaching our holdings herein, we have considered all arguments made, and to the extent not mentioned above, we conclude them to be moot, irrelevant, or without merit.

To reflect the foregoing,

*An appropriate order will be issued, and decision will be entered under Rule 155.*